Case number 24-1092, Chey Davis v. Delta College et al. Arguments not to exceed 15 minutes per side. Ms. Howard, you may proceed. Good morning. Good morning, and may it please the court, my name is Sarah Howard. I'm proud to represent the plaintiff appellant Chey Davis here this morning. I would like to reserve four minutes for rebuttal, please. Okay. This morning I'd like to talk about the trial court's error in dismissing this case and missing the fundamental questions of, is there enough record evidence for this case to go to a jury? The trial court misapplied with respect to the failure to promote claim, the burden shifting analysis that we do in a race discrimination claim on failure to promote or any other type. As this court has recognized, there's widespread confusion about how to properly apply a McDonnell-Douglas burden shifting analysis in the trial courts. And that's exactly what has happened here. It is clear that the trial court here improperly considered and shifted, smushed all of the three stages together when it considered the record evidence. The trial court improperly considered the defendant's arguments about its proffered reason as to whether or not my client could meet the prima facie case of being similarly qualified to other applicants not in the protected class who were promoted. This court has said that the burden shifting analysis can obfuscate what is the appropriate question. That's exactly what happened here. Is there enough evidence to show the existence of a genuine issue of material fact? In here, the trial court said what the defendants used as their proffered reason, focusing in on one criteria of many that was supposed to be considered, meant that she was not similarly qualified and therefore could not meet the prima facie case. Can I ask, setting aside just the evidence of pretext, what qualifies? Is it your view that it's kind of a tangible employment action not to have received the title because the title changed to full professor? Because as I understand, your client did get promoted. It just happened later. Yeah, and did get with back pay. So what is the harm? If you had just mediated this case and you got offered that, I would have thought that would have taken care of it. What additional? I mean, absolutely not, Your Honor. In an employment case, you have both economic damages and non-economic damage. And there is real harm in being denied a promotion on the basis of your race, even if two and a half years later, a new decision maker corrects the action and pays back pay. You still have non-economic damage for the failure to promote on the basis of your race. This decision was long done and over by the time a new decision maker came in and made it right, so to speak, by retroactively putting in place the promotion. But the new decision maker didn't make it fully right. There's no way to do that once the decision is over. And the cases support that even if you were denied pay for a month or so and the employer paid it back, that does not negate the harm of being discriminated against. And that is certainly true here. I think it's very hard to say that you could live for two and a half years being denied a promotion you were entitled to, that the peer review faculty committee all believed you should get. Every other dean who looked at it believed you should get. Two and a half years later, oops, it's not enough to pay back pay. That doesn't ameliorate all of the harm. Certainly they knock out the economic damages portion of the claim. I'll concede that. But there is significant non-economic damage to being discriminated against on the basis of your race. And there's more than enough here given the body of evidence with respect to the old president who is one of the two defendants here to suggest that this decision was made on the basis of race. They might not agree with us, but that's not the question for the trial court and the trial court shouldn't have dismissed on summary judgment. With respect to the constructive discharge claim, the district court also improperly dismissed it at the summary judgment stage. This court has said failure to promote plus other elements can be enough to go to a jury about whether or not a plaintiff has been constructively discharged. The other elements are the racial microaggressions that my client was subjected to. But it's my understanding that the culprit had retired at the time your client left. And I think a constructive discharge has to be continuing. So if those statements did not continue at the time your client decided to switch jobs, I don't see how they can factor into a constructive discharge claim. In this particular case, it does, Your Honor. The circumstances of this case are somewhat unusual in that the failure to promote is a fairly significant act which would encourage any reasonable person to be forced to resign. And in this particular case, there was a great deal of evidence about how there was no opportunity for my client to go and find other similar work. So you've got the failure to promote. Would you at least agree that it has to be continuing? That the harms that are forcing an employee to resign have to exist at the time the employee decides to resign? I'll at least agree it would help if they're continuing. And in this case, they are continuing. But you would agree, though, that the statements weren't continuing because the president had retired. As of the time Dr. Goodenow retired, her statements were not continuing. Were there other culprits? There was an environment on this campus of continuing discrimination. There was evidence about how the system she had set up, the other administrators she had, created an environment of hostility which continued. There's evidence about that and that it was going to take some time to right the ship, so to speak, after she left. And my client left at the first opportunity that she had to find replacement employment. She pursued another degree so she could take a different, so she could engage in a different profession. Is your position the year after Goodenow left was just as bad as the time before? My position is it was still an environment of constructive termination, yes. I don't know if you can say it was just as bad because you don't have Dr. Goodenow still at the helm, but just because it wasn't. Who I thought was at the center of most of her concerns, right? Absolutely, she was at the center, Your Honor. It just seems really strange to call it a constructive discharge when so much of the problem has been resolved. Well, I don't think it's strange when you consider the testimony that she, Dr. Goodenow, created an environment of continuing hostility. That the administrators, the lower-tier administrators that she had put in place were still working there. That there was still this understanding of this is how things on this campus operated, even after she left. There was testimony by the new president, who of course is a witness of the college, that it was going to take some time to right the ship after Dr. Goodenow had left. You know how unlikely it is that if I left this job and I said to all my colleagues, just keep doing all the bad things I did, they would do that? It seems so strange to me. You get rid of the president no one likes or the president that misbehaves here and there. To think that, wow, this legacy is really hard to overcome without her here. I think that would be an excellent, compelling argument for the jury if you were defense counsel, Your Honor. But I don't think it's enough to say at this stage, could a reasonable jury not find for my client unconstructive discharge? They might hear about the racial environment there and the environment in general that this individual created. And they might agree with my client, yes, I would feel compelled to leave under those circumstances, which is really the test. Would a reasonable person feel compelled to leave? So I think that's a great argument that I would make to the jury. And I'm sure that my colleagues will. But it's not for the trial court judge to say, I don't think a reasonable person would no longer feel compelled to leave. I was going to ask you about First Amendment causation. Yes, Your Honor. So you say that when Goodenow denied Davis's application, it was her first meaningful opportunity to retaliate against Davis, right? That's kind of your exception to the temporal proximity problem that you've got. But I don't know why that's true, because Goodenow is still Davis's boss for all of that time. And there are lots of things that deans can do to faculty members short of, I mean, I know she's tenured. But there are all kinds of things that deans or college presidents can do to faculty members other than kick them off the faculty. Like committee assignments, and you're going to teach all the night classes, and you're going to not have a travel budget to go to conferences, and you don't have a research budget. There's all kinds of things, people. So you say this was the first opportunity, but you just say that. Like there's no evidence in the record to, or maybe there is, and I just didn't see it. Well, Your Honor, I would say this. I would agree there's lots of negative things that can happen in academia, even if you're a tenured faculty member. But I don't know that any of those rise to the level of an adverse employment action. This was definitely her first opportunity, and significant opportunity, to engage in retaliation. So if she were assigned all the bad classes, like let's say everybody knows, like teaching the night classes to the low-level students, that's the terrible assignment, and everybody knows it, and that was done in retaliation for First Amendment, that wouldn't cause a reasonable person to think, oh gosh, I better not speak because I'm going to be doing all the night classes? That certainly would, if it were me, cause me to feel retaliated against. But that's not the only significant retaliation that could be undertaken. I think the... Right, but your point is denying her the promotion was the first opportunity that Goodenow had to discriminate against Davis. And I'm just saying it seems like there was a lot of opportunity in there, or to retaliate. I'm sorry, not discriminate, retaliate. I would say it was the first meaningful opportunity where we are. She's teaching at a community college. It's a different structure, I think, than perhaps what you're talking about. Doesn't she get assigned to teach certain classes and serve on certain committees, and some are good and some are bad? Sure, but I don't... You want to go to a conference, you need a budget. I don't... Here, though, what I have to show is that there's sufficient temporal proximity and other factors, and I think we have plenty of other factors here to demonstrate that the five or six, perhaps seven months that went between the time of the presentation of the union petition and the first time President Goodenow denied the promotion, which is earlier than the final denial of the promotion, but she first indicated that she would deny the promotion in March, not all the way at the end of the year in 2019. But that's just by telling somebody else, right, that I'm going to deny it, not by taking any formal action. Well, she told her she was going to deny it, and then she did do so. Then it went through the appeal of the grievance procedure because she had applied the wrong policy. But it was clear from the... She had made the decision at that point that she was not going to promote her. So she made the decision whether or not she made it public to my client is of no consequence here. All right, we'll have from the other side. Thank you. Thank you. Good morning. Good morning, Your Honors. Garvey Sashatall, I represent Dr. Goodenow in this matter, and I will be speaking for nine minutes. I'd like to pick up on what Judge Larson ended on, which is the First Amendment causation issue. And I think you've raised a good point in terms of this first opportunity to retaliate. You know, Ms. Davis has held up her tenured status as though it's some sort of cloak of invincibility, and that it somehow prevented Dr. Goodenow from taking any adverse action. But the reality is that she was the college president. And Ms. Davis herself acknowledged at her deposition that she had ultimate supervisory authority over her. There are, as Judge Larson noted, several things that Dr. Goodenow could have done if she wanted to retaliate after the August 18th petition delivery. She didn't take any of those actions. And the court, this court, has held in the Dixon case, which was the case we cited in our briefing, that that's all that's needed, the opportunity to retaliate. And in the Dixon case, the court found that it was a reinstatement case, which is another sort of hallmark of these first opportunity to retaliate causation claims. The court found that in that case, the defendant, the bad actor, had been the plaintiff's not immediate supervisor, but did have supervisory authority over him for several years, and had the opportunity to retaliate and could have easily exercised that opportunity had he been so inclined, and he did not do so. I want to also... I think it does strike me this is an unusual case in that it seems like at least the college itself subsequently found that the employee was qualified. And why isn't that, I mean, it's not usually the case that the same entity says, oh, we made a mistake, or different agents of the same entity said, oops, we made a mistake, she really should have gotten this promotion. Why isn't that pretty good evidence of pretext of discrimination? Well, I think it's a good question. And I would point out two things. First of all, Dr. Gavin, who became the president after Dr. Goodnow and reversed Dr. Goodnow's decision, testified that it was a difference of opinion. Not that Dr. Goodnow was wrong or that she made a mistake, just that they reached different conclusions looking at the same pieces of evidence on Ms. Davis's qualifications. And number two, the law does not allow a plaintiff to prove pretext just because the decision maker made a mistake. In Michigan, which is... the claim is brought under the Elliott Larson Civil Rights Act, there are Supreme Court cases that were cited in our briefing that make this very clear. You cannot establish pretext just by showing the decision maker made a mistake or was incompetent in their decision making. And that's essentially what these pretext arguments boil down to. And we just heard it here in oral argument. Everyone else thought Ms. Davis should have gotten this promotion. The peer review committee, all of the department chairs thought that she should have gotten it. And Dr. Goodnow was the only one who didn't think that. But that doesn't show that the reason Dr. Goodnow thought that is because of Ms. Davis's race. Isn't that difference of opinion, though? Good circumstantial evidence? I mean, you're never going to have direct evidence or rarely going to have direct evidence of discrimination. So you have to look at what circumstantial evidence that exists. Absolutely. And why isn't that, I mean, circumstantial evidence? If everybody else on the faculty thought she warranted a promotion to full professor, couldn't a reasonable jury use that as a basis to find that the student evaluations were pretext for discrimination? I think that's possible if there was evidence, say, of disparate treatment. The second decision, was there a reassessment of the evaluations? Or was there just a disagreement about how much they counted? I think you're talking about the final decision in December? Yeah. So in that decision, the only thing that was changed was she was no longer relying on leadership. So I don't believe that there was, I think she looked at it again, but I don't think she reached a different conclusion in terms of student evaluations. I think you were talking about President Gavin. Oh, you're talking about Dr. Gavin's decision. So he testified that he didn't believe, he thought that this context that Ms. Davis is urging the court to consider should have been applied, and that he didn't view the student evaluation, he agreed the scores were lower and that they didn't meet this 90% threshold. The way you show pretext is show that the decision maker's reason is not the real reason, right? Right. The second decision maker says, I'm not questioning her assessment of the evaluations, I'm just putting a different weight on something else. I'm not sure that, anyway. Well, I'm not sure where you were going. No, no, no, I mean, I guess it's a helpful question, because I'm just saying, I thought the point was you had to show there's something else going on here, and that's not what this showed. Exactly, and I think that was sort of my point, is that Dr. Gavin also agreed that the scores were lower. He also agreed that Ms. Davis' scores didn't meet the 90% benchmark that usually apply to those scores, which was one of the reasons Dr. Goodnight identified as why she didn't promote Ms. Davis. He just didn't think that that was a reason to deny her the promotion, given the other qualifications. And, you know, I think we also have to look at the context, the other evidence here, going back to your point, Judge Murphy, about circumstantial evidence. There's testimony in the record, and it's undisputed, that Dr. Goodnight applied the same standards when she evaluated Ms. Davis' promotion packet that she did with everyone else's. And it's undisputed that she was not a rubber stamp for the lower rungs of the review process. Now, this may have been the only time she disagreed, which is a hat that, you know, they've sort of hung their hat on this fact. But the bottom line is that nothing was different here. That was the testimony of Dr. Curry, the vice president, who had reviewed, I want to say, like 15 to 20 promotion packets with Dr. Goodnow over the years. And Dr. Goodnow herself said that she conducted every promotion process the same. She thoroughly and separately reviewed each piece of the promotion packet that was submitted, including the student evaluation scores. And there were other sort of issues with Ms. Davis' student scores, not just that the scores were low or the comments were negative. For example, she didn't produce the full range of, for years, I think they wanted five years of student evaluation scores. That information was not produced, which was another unusual feature of this promotion packet. I think Dr. Goodnow's testimony was she had never had an applicant applying for full professor who had not produced the full range of student evaluation scores. So, you know, I think that's another. There is a lot of evidence to suggest that here, that, you know, the kind of treatment in terms of the promotion was not any different than anyone else's treatment by Dr. Goodnow. And the fact that Dr. Gavin came in and said, hey, I have different criteria, and I view this differently, doesn't by itself show pretext. I only got 30 seconds, so let me just touch on the constructive discharge claim. I think it's very significant that Ms. Davis has not cited a single case to this court that would allow constructive discharge to be found under the circumstances of this case, where the alleged perpetrator, the person that's creating these intolerable working... Just help me out with something I should understand already. Does that matter if we think there's already an adverse employment action because of failure to promote? No, those are two separate... Two separate claims? Two separate claims, yes. So it does make a difference? Correct. That's my understanding of the claims as they were brought by Ms. Davis. All right, well, thank you very much. We'll hear from the other person on your side. Mr. Henley. Thank you, Your Honor. Good morning, Your Honors. Roy Henley, appearing on behalf of Delta College. Just that last point, just to help me make sure I'm not confused about something. If you've got one theory... Are there two separate claims in the adverse employment action? So failure to promote seems like the better claim in terms of showing that something happened to you. But I'm just trying to figure out if we have to worry about the constructive discharge at all. Do we? I don't think that you do. There is no case law at all that would suggest that someone who gets everything that they want and their archnemesis is gone has been constructively discharged. But just so we're on the same page, I'm saying hypothetically one takes the view the failure to promote was an adverse employment action. That's not good news for your side of the case. Do you have to get into the constructive discharge or not? I think that's going to depend upon how you measure damages. I see. Okay, I got it. Good answer. All right. Okay. Backtracking just a little bit, though, and to expand upon the panel's questions. That's been implicated very heavily for Delta College because we're in the somewhat unusual position of essentially defending both Dr. Goodnow's decision and Dr. Gavin's position. And that raises what I'd submit is the problem that you have in any kind of institution of higher education like this with what some of my colleagues have called the too much greatness in the room quandary where you've got subjective decisions being made by people who are very high achievers. Certainly Ms. Davis was no exception. She was tenured. She was an associate professor. And Ms. Davis has characterized that argument as somehow increasing the burden of proof on a prima facie case. I'd say that's inaccurate. It's more of a difference in qualitative proof where, you know, certainly like in the Bickerstaff case, you had another institution that was focused upon teaching undergraduates. You know, promotion was denied based solely upon student evaluations. And that was fine. That's very reminiscent of this case. However, to say that, you know, when Dr. Gavin came in and said, I understand that her teaching may have been lacking a bit, but as the chief administrator of the college, I don't feel comfortable going against her department's recommendations. I personally see outside leadership as more important than Dr. Goodnow did. That's certainly perfectly reasonable as well. And the line of cases cited in our brief says this is where courts defer. Chevron deference. It's like Chevron deference. You can do two opposites and they're still reasonable. That's absolutely true, yes. It was overruled. It was overruled, you know, in Michigan under state law. Very unfair. Very unfair, sorry. I am troubled by the notion that we should give academic administrators deference in employment cases. Why? Is your point it's so subjective that too many claims will go to the jury? It just seems to me that this was student evaluations of an English professor. I mean, we do a lot of writing. It's not like some highly technical area where I have no idea to evaluate whether somebody is due a promotion or not. It just didn't make much sense to me to see why academic administrators, among all the other types of jobs in the universe, should get more deference. I think it's due to the qualitative nature of things that they're looking at. For example, in the unique context of community colleges, unlike say a Vassar or Carlton or Williams, their students aren't always looking for advanced literary criticism. Some are though. Some are looking to transfer their English credits to institutions like that. Others, as the comments show, as we've cited in our brief, are saying, I didn't like Ms. Davis' teaching. All I want to do is learn how to use a comma. What's all the rest of this stuff? Or write an essay. So part of the job is not just understanding of the material and being able to really teach an interesting course, but in community colleges, looking at the different students you're servicing, knowing the difference between those students and what they're looking for, and directing that instruction appropriately. So here we have a situation where the reliance was very heavy on the students' evaluations of the courses. And that was certainly legitimate by Dr. Goodnow. On the other hand, Ms. Davis had some other very fine qualities, and Dr. Gavin was more focused on those. So there are so many different factors. What is leadership? What other things are you doing? How does your teaching relate to everything else? Dr. Gavin was looking at all these other factors and said, not so much that we made a mistake, that it was wrong, but that he saw the balance of factors, these subjective factors, very differently. And thank you. Thank you very much, Your Honors. Thank you. Ms. Howard, you've got, I think, what did you say, three minutes of rebuttal? Four minutes, Your Honor. Here's the thing. What they're arguing are the types of arguments that you make to the jury. It is absolutely disputed, not undisputed, that 90% was some sort of magic benchmark over which you had to leap. There were a number of ways of showing teaching excellence. Dr. Goodnow certainly testified in this case that she always looked for a certain benchmark. Other people argued, like Dr. Gavin, that she appeared to be picking and choosing what she was looking at. That was part of his testimony. He argued it didn't make sense to him that she would completely overlook. Right, but by picking and choosing, he meant promoting one metric over another metric, not that she didn't always look at the same metric. Well, he didn't know what she did because they weren't there at the same time looking at it. Well, then how can he testify to what she was doing if he didn't know what she did? Because he was looking at, having spoken to Dr. Curry, to Dr. Cromer, Dr. Goodnow appeared to shift. At first, she said, well, the peer review committee didn't really find that, and then she had to concede that they did when the paperwork backed her up. He said she was picking and choosing in that she seemed to be looking for a reason, according to his testimony, to not promote my client. This is more than just a difference of opinion about one set of people views it one way, one set of people views it another. There is enough here for a jury to infer that what Dr. Goodnow was doing was looking for a reason not to promote my client. But even if she was doing that, what's the inference that it was because of race? Because if she just didn't, there are lots of reasons she might have been doing that, but it has to be because of race. It has to be because of race, and the way that we show that inference is through meeting these elements, and then they can make those arguments to the jury. But we've made enough of a prima facie. We have met the burden-shifting analysis to get to a jury and say, you could view this body of evidence and say this particular person appeared to be using race. That was her real reason, not this 90% student evaluation threshold that she seems to be grafting onto. There is no reason to give academics more leeway about whether or not someone's qualified. They had a whole... I mean, first of all, she clearly applies the wrong policy. It gets sent back to her for that reason, and she gloms on to this issue, which she said she had applied before, but there's no meaningful... My client had extensive leadership and she said, well, I don't consider off-campus leadership. And she, again, wrote into the criteria other issues which are not written into the criteria which hadn't been used before. The qualifications of my client were very similar to all of the other candidates who had been promoted. This president had never failed to take the recommendation of faculty. She had always promoted people to full professor. This was the only person out of 16 years she had ever failed to promote to full professor. When every... Did she promote other black people to full professor? Hardly any. The vast majority of the candidates were white, Harry, Your Honor. And in this... Again, all of these arguments by my colleagues are great ones to make to the jury, but this obfuscates the purpose that we have this test, which is, is there enough to present a genuine issue of material fact to a jury, which we certainly have here on the failure to promote claim. All right. Thanks to both of you for your helpful briefs and oral arguments. The case will be submitted.